GARY M. RESTAINO
United States Attorney
District of Arizona

JOSEPH F. BOZDECH
California State Bar Number 303453
Assistant United States Attorney
Two Renaissance Square
40 North Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone: (602) 514-7500
Email: joseph.bozdech@usdoj.gov
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>$52,218.00 in United States Currency,<br><br>Defendant *In Rem*. | Case No.<br><br>**VERIFIED COMPLAINT FOR FORFEITURE *IN REM*** |

Plaintiff United States of America brings this complaint and alleges as follows in accordance with Rule G(2) of the Federal Rules of Civil Procedure, Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions:

**NATURE OF THE ACTION**

1. This is a civil action *in rem*, brought to enforce the provision of 21 U.S.C. § 881(a)(6) for the forfeiture of property which represents money or other things of value furnished or intended to be furnished by a person in exchange for a controlled substance, proceeds traceable to such an exchange, and money used or intended to be used to facilitate a violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*

2. This is a civil action *in rem*, brought to enforce the provision of 18 U.S.C. § 981(a)(1)(A) and (C) for the forfeiture of United States currency which constitutes or is derived from proceeds traceable to a violation of a specified unlawful activity, including but not limited to dealing in a controlled substance and 18 U.S.C. § 1952, travel in

interstate commerce with the intent to distribute proceeds of unlawful activity as defined in 18 U.S.C. §§ 1952, 1956(c)(7), and 1961.

3. Venue and jurisdiction in Arizona are based upon 21 U.S.C. § 881(j), and 28 U.S.C. §§ 1355(b) and 1395 as acts and omissions occurred in the District of Arizona that give rise to this forfeiture action. This Court has jurisdiction. 28 U.S.C. §§ 1345 and 1355, and 18 U.S.C. § 981(h).

**DEFENDANT *IN REM***

4. The defendant is $52,218.00 in United States currency ("defendant property") seized on January 10, 2023. The defendant property is in the custody of the United States Marshals Service.

**INTRODUCTION**

5. The following information depicts an investigation conducted by members of the DEA Financial Investigation Group's Commercial Narcotics Interdiction Unit (FIG/CNIU), based out of the Phoenix Sky Harbor International Airport, to which Drug Enforcement Administration (DEA) Special Agent Kenneth Theriault (SA Theriault) is assigned. The primary responsibility of this unit is to investigate crimes involving the use of commercial airlines and shipping companies to transport illegal drugs and drug proceeds.

6. Based upon the experience of FIG/CNIU investigators and investigations across the country, it is common knowledge that cities located in the eastern, Midwest, and southern United States (including Indianapolis) are known demand locations for illicit drugs. Additionally, it is also known that cities located in western and southwest border states (including Phoenix) are considered source locations for illicit drugs because of availability, quality, place of origin, favorable growing conditions, and their close proximity to Mexico and the established illicit drug trafficking routes and distribution networks to source cities.

7. Moreover, it is known that the proceeds from the sale of illicit drugs are transported from demand locations to source locations. Once the proceeds from the sale

of illicit drugs reach source cities the proceeds will be used to purchase more illicit drugs. The illicit drugs will then be shipped or carried by couriers to the demand locations for sale and distribution. Illicit drug trafficking organizations and illicit drugs are purchased in source locations for relatively low cost and sold in demand locations for a significantly higher price thus creating high profit margins.

8. Based on training and experience, investigators have learned that persons involved in the trafficking and distribution of illicit drugs use commercial airlines to transport the proceeds from the sale of illicit drugs due to the convenience and expediency of airline travel. This method of travel allows for last minute travel arrangements, often within forty-eight hours of departure, and the ability to travel long distances in short periods of time. Moreover, the use of couriers aboard commercial airlines and parcels shipped and/or mailed by commercial shipping companies provide lower risk of detection by law enforcement and lower operating costs.

9. Based on training and experience, investigators have learned it is also common for these illicit drug/money couriers to travel on one-way tickets due to the uncertainty and volatile nature of the illicit drug trafficking and distribution business. Persons traveling to source cities from demand cities with U.S. currency to be used to purchase illicit drugs often contend with several logistical issues before the drug transaction is complete. In those instances when illicit drug money couriers purchase roundtrip tickets the return flight is commonly scheduled a short time (frequently within 48 hours) after the arrival. Illicit drug money couriers traveling with co-conspirators often divide the couriered money among each other and distance themselves from one another during travel to be inconspicuous and lesson the risk of loss of the proceeds.

10. To identify and disrupt potential drug and/or money couriers related to drug trafficking organizations and criminal syndicates, investigators utilize a variety of resources including confidential informants, flight itineraries, other law enforcement agencies, and criminal intelligence. Factors which constitute suspicious flight itineraries include but are not limited to, airfare purchased at the ticket counter within forty-eight

3

hours of departure, last minute reservations for one-way travel, and airfare paid for in cash or by a cash card. Additionally, it is common practice for drug money couriers to utilize a third-party and/or a third-party credit card to purchase airfare. It is also common for illicit drug money couriers to provide fictitious identifying information to airline companies such as telephone numbers which are inaccurate or not in service and non-valid addresses. Illicit drug money couriers will often attempt to board aircraft at the last possible moment and travel with minimal personal belongings in their luggage.

## BACKGROUND

11. On January 10, 2023, members of the FIG/CNIU assigned to the Phoenix Sky Harbor International Airport received a ticket tip listing the flight itinerary for passenger Jacque Alexander Glessner (Glessner) traveling aboard American Airlines flight #2626 from Indianapolis, Indiana to Phoenix, Arizona on a one-way ticket.

12. Glessner's travel ticket was purchased the day before travel.

13. A check of the law enforcement databases revealed Glessner had a drug criminal history including a conviction following a December 2017 arrest by the Tempe, Arizona Police Department for possession of narcotic drugs and equipment for manufacturing, a class 4 felony, with an accompanying seizure of $27,629.00 in U.S. currency. Glessner received a sentence of 18 months.

14. Investigators responded to Terminal 4 (Gate A-25) of the Phoenix Sky Harbor International Airport, where the flight was due to arrive at approximately 9:54 a.m.

15. Prior to the flight's arrival, investigators obtained a photograph of Glessner via a law enforcement database.

16. As passengers disembarked from the flight, a passenger matching Glessner's description exited the jet-way.

4

**Contact with Jacque Alexander Glessner**

17. After exiting the plane, Glessner was consensually contacted by DEA Task Force Officer (TFO) Richard Lamberto in an open concourse area, free of restrictions of movement.

18. TFO Lamberto introduced himself as a Phoenix Police Detective/Task Force Officer, and assigned to the DEA, simultaneously displaying his law enforcement credentials.

19. TFO Lamberto asked Glessner if he could speak with him to which Glessner agreed.

20. When asked, Glessner handed TFO Lamberto his Arizona driver's license for identification purposes. TFO Lamberto returned the license to Glessner.

21. When questioned about his carry-on bags, Glessner told TFO Lamberto he was not traveling with any contraband, drugs, or large amounts of currency.

22. TFO Lamberto asked Glessner for consent to search his carry-on bags, but Glessner was hesitant and did not want his bags to be searched.

23. TFO Lamberto explained to Glessner a search warrant would be authored for his carry-on bags.

24. Glessner told TFO Lamberto he was traveling with approximately $27,000 but did not have any illegal drugs.

25. TFO Lamberto asked Glessner if investigators could verify the amount of currency inside his carry-on bags. Glessner consented and handed one of his carry-on bags to investigators.

26. Glessner then handed his other carry-on bag to TFO Lamberto and told TFO Lamberto that he could search the second bag as well.

27. Glessner told TFO Lamberto the money belonged to his dad and he was going to buy a car with the money, but never did.

28. Glessner also told investigators he was in the Indianapolis area for a couple of days visiting family.

29. TFO Lamberto asked Glessner, again, if he knew the amount of currency in his possession and Glessner said it was around $40,000.

30. Investigators searched Glessner's carry-on bags and located multiple bundles of currency, consisting mostly of newer $100 bills, concealed throughout Glessner's carry-on bags.

31. Due to the significant amount of currency, TFO Lamberto asked Glessner if he would come to the CNIU office to count the currency and discuss its origin.

32. Glessner agreed, and was accompanied by investigators to the CNIU office.

### Interview at FIG/CNIU Office

33. Upon arriving at the FIG/CNIU office, investigators obtained Glessner's biographical information and continued the interview.

34. Glessner provided a current residential/mailing address of 6430 E Star Valley Street, Mesa, Arizona 85215.

35. Glessner stated he resides at this location with his grandmother, Janet Glessner.

36. Glessner told investigators he does not pay rent, have a car payment, or pay credit card bills, but does provide money for groceries.

37. Glessner had two cell phones in his possession, which he said his parents paid for.

38. Glessner provided the phone number to one of his phones, XXX-XXX-1102, but did not know the number to his second phone.

39. When questioned about the origin of the currency, Glessner told TFO Lamberto he borrowed the money from his dad, John Glessner, and he was giving it back.

40. Glessner did not know when his dad gave him the currency.

41. Glessner had multiple deposit/withdrawal slips from the Bank of America inside his wallet, along with his Bank of America debit card.

42. Glessner had a deposit slip from Desert Financial Credit Union for $9,000 and a cashier's check for $45,000 payable to himself withdrawn from the same account dated January 3, 2023.

43. When questioned about his employment, Glessner stated he works for his dad at the dairy farm and gets paid with cash.

44. Glessner told investigators he sells property.

45. TFO Lamberto questioned Glessner about his trip.

46. Glessner stated he flew to Wisconsin on Friday, January 6, 2023, and flew out of Indianapolis on January 10, 2023.

47. Glessner told investigators he planned on staying there for a few weeks, "hang out" and drive around.

48. Glessner stated he drove around with the currency all weekend with a rental car.

49. When investigators asked Glessner about the purpose of the currency, Glessner said he just wanted to have "cash" on him and said "you don't know what you're going to come across" referring to possibly buying a car.

50. Glessner told investigators he prefers to have cash on him rather than to keep it in a bank.

51. The currency found in Glessner's two carry-on bags were placed together to be counted.

52. Prior to the currency being counted, a narcotics canine was utilized to conduct a sniff test on the currency for an illicit drug odor, but the canine gave a negative alert.

53. The currency in Glessner's possession was largely made up of newer, crisp $100 bills.

54. In addition to the currency, investigators found two notebooks in Glessner's carry-on bags.

55. One notebook appeared to be a day planner for the year 2023.

56. Investigators believe that the second notebook is a drug ledger.

57. The drug ledger contained lists of items commonly used in a marijuana extraction clandestine lab, including Ohaus scales, quarter size jars, hot plates, and "flower," as well as a note reading "10 to 1 Ethanol to crude." Ethanol is commonly used in marijuana extraction processes.

58. The drug ledger also contained notes about acquiring "burner phones" for workers, and price listings for "QP" (quarter-pound) quantities of "wax." Investigators believe "wax" to refer to marijuana extracts. The drug ledger also contained pricing for mushroom gummies, believed to be hallucinogenic candies.

59. The drug ledger contained references to accounts at Desert Financial and Bank of America, and listed account balances similar to those reflected in the bank transaction receipts found in Glessner's carry-on bag.

60. TFO Lamberto contacted Glessner's father, John Glessner, by cell phone.

61. When questioned about the amount of currency he gave to his son, John Glessner said he did not know exactly how much but that it was probably "just north of $50,000.00."

62. John Glessner said his son was supposed to be looking for a vehicle, specifically a Chevrolet 1500 eco diesel truck.

63. John Glessner said he had received quotes from individuals for a truck in the low $50,000 range.

64. John Glessner said he has emails with the truck information.

65. When asked about his son's trip and whereabouts, John Glessner said his son was going to Indiana but was not exactly sure about his travels.

66. The following represents a breakdown of the currency, which was seized.

| Number of Bills | Denomination | Amount |
|---|---|---|
| 518 | $100.00 | $51,800.00 |
| 1 | $ 50.00 | $     50.00 |
| 18 | $ 20.00 | $   360.00 |

8

| | | | |
|---|---|---|---|
| 19 | $ 5.00 | | $ 5.00 |
| 3 | $ 1.00 | | $ 3.00 |
| **Total** | | | **$52,218.00** |

67. The investigative count revealed Glessner was transporting $52,218 of suspected drug proceeds.

68. Based on the information from the consensual encounter and the interview with Glessner, investigators advised Glessner the money would be seized and subject to administrative forfeiture proceedings.

69. Glessner provided investigators with his a mailing address to receive notification.

70. Investigators provided Glessner with an email address where Glessner could send any documentation that supported the legitimacy of the money.

71. Glessner signed the DEA-12.

72. Glessner was provided with a copy of DEA-12 and was advised additional notification and instructions would be sent in the mail.

73. Based on the above information, investigators believe the currency found in Glessner's possession was not legitimately earned and is likely the proceeds from illicit drug sales and/or was intended to be used to purchase illicit drugs.

74. On March 1, 2023, DEA sent a Notice of Seizure of Property and Initiation of Administrative Forfeiture Proceedings to John Glessner and Jacque Alexander Glessner.

75. On March 30, 2023, DEA Headquarters received a claim from John W. Glessner, Jr., signed on March 22, 2023.

76. John W. Glessner, Jr., in his claim stated he wired his son, Jacque Glessner, the sum of $60,000 via two wire transfers, one for $10,000 on June 6, 2022 and the other for $50,000 on July 11, 2022.

77. John Glessner submitted records for a $10,000 wire transfer on June 6, 2022, and a $50,000 wire transfer on July 11, 2022, though it is not apparent from the records from which accounts or persons the transfers were sent or received.

78. John Glessner also submitted transaction records for seven cash withdrawals from a checking account ending in 6442 of various amounts, each less than $10,000, conducted between August 1and September 22, 2022.

79. The purpose of the money was for his son, Glessner, to locate and acquire for him (referring to John Glessner) a used 2021-2022 Eco Diesel Silverado Pick Up Truck.

80. John Glessner claimed Glessner flew to Wisconsin to visit a friend, and on his way home, he stopped in Indianapolis to check out a truck he found on Craigslist.

81. John Glessner stated Glessner took cash because that is the best way to get a good deal on a used vehicle.

82. According to John Glessner, Glessner did not purchase the truck because it had been in an accident, and Glessner flew back to Phoenix with the money in Glessner's luggage.

**Jacque Alexander Glessner's Criminal History**

83. A check of law enforcement databases revealed Glessner had drug criminal history for dealing in narcotic drugs.

84. The criminal history inquiry for Jacque Alexander Glessner revealed the follow drug-related arrests:

    a) On or about December 24, 2017, Glessner was arrested by the Tempe Police Department for endangerment, possession of marijuana for sale, possession of narcotics for sale, possession of narcotic equipment for manufacturing, illegal control of enterprise, money laundering (concealing proceeds). Glessner was found guilty of possession of narcotic drugs and equipment for manufacturing and sentenced to one year and six months in prison.

10

b) On or about December 24, 2017, a search warrant conducted at Glessner's residence resulted in law enforcement finding 46.59 kilos of hashish oil and 133.95 kilos of marijuana. Glessner was in possession of professional grade butane has oil extraction lab equipment and hazardous waste and other contaminated items from the manufacture and/or production and/or distribution of the dismantled clandestine laboratory.

c) A search of law enforcement information exchange revealed Glessner has been arrested for the following charges which are not listed on his criminal history: possession of marijuana dated February 25, 2012 and possession of marijuana for sale and drug paraphernalia dated February 21, 2010.

### Jacque Glessner and John Glessner's Income

85. Law enforcement's check of Glessner's income revealed the sources of much of Jacque Glessner's income are unverified but appear to include transfers from escrow businesses owned by Glessner's father, John Glessner, similar escrow businesses in the name of Jacque Glessner, transfers from family members as gifts, and ATM and cash deposits from unknown sources.

86. Deposits, withdrawals, and transfers between accounts show multiple patterns of structing.

87. Jacque Glessner claims to be a restaurant owner but no specific restaurant has been identified in affiliation, nor are there any deposits to accounts associated with him that are identifiable as payroll or proceeds from a restaurant business.

88. A large number of incoming ATM deposits is inconsistent with either a restaurant or escrow business.

89. Records show approximately $1,924,430 of suspicious incoming funds from unknown sources from 2018 to 2023 for Jacque Glessner, including the following transactions:

a) $401,267.54 check deposits into Desert Financial money market account;

b) $379,324.93 wire transfer into Desert Financial money market account;

c) $115,100 ATM/cash deposits into Desert Financial money market account;

d) $24,086.29 Apple Cash deposits into Desert Financial money market account;

e) $130,000 wire transfers into Desert Financial checking account;

f) $155,040 ATM/cash deposits into Desert Financial checking account;

g) $58,985 structured deposits into Bank of America account;

h) $197,847.30 wire transfer from Granite Escrow & Settlement to Bank of America account;

i) $462,779.33 cashier's checks transferring funds from Jacque Glessner's Desert Financial account to his TD Ameritrade account.

90. In addition to his purported escrow business, John Glessner is affiliated with farming business Pacific Egg Ranches, LLC and Ida Beef Sales.

91. Approximately $227,740 in suspicious incoming funds were transacted into accounts owned by John Glessner, including the following transactions:

a) $132,740 cash deposits into J.P. Morgan Chase account;

b) $95,000 transferred to John Glessner's Chase account from Janet Glessner's Chase account. The origin and purpose of the preceding deposits into Janet Glessner's account is unknown, and her account appears to be used as a funnel account into John Glessner's account.

92. Glessner has a criminal history of illegal manufacture of narcotics.

93. Notes in the drug ledger found in Glessner's luggage refer to chillers, water heaters, solvent, silica, B-80, gas/nitrogen/iso, ethanol, hotplates, and king bed frames/sheets/blackout curtains, new burner phone for workers, and other references consistent with manufacture of narcotics.

94. Glessner's financial record show a January 14, 2022 $7,003.75 purchase from cannabis extraction company Bizzybee

95. Other activity related to potential drug manufacturing include $5,180 and $5,088 purchases from industrial scale manufacturer Arlyn Sales on February 20, 2020 and April 27, 2020, as well as $4,299.23 purchase from Prime USA Scales on August 28, 2022. Glessner also rented self-storage units from multiple companies.

### Jacque Alexander Glessner's Flight History

96. Investigators subpoenaed American Airlines, Delta Airlines, Southwest Airlines and United Airlines requesting the historical travel information of Glessner.

97. United Airlines and Delta Airlines returned notice that within the previous year, there was no record of Glessner flying with their airline.

98. The following is a summary of flights taken by Glessner from American Airlines and Southwest Airlines.

| Date | Departing City | Connecting City | Destination City | Airline |
|---|---|---|---|---|
| 03/03/22 | Phoenix, AZ | | San Francisco, CA | American |
| 03/16/22 | Humboldt County, CA | | Phoenix, AZ | American |
| 04/01/22 | Phoenix, AZ | | Los Angeles, CA | American |
| 04/24/22 | Phoenix, AZ | | Sacramento, CA | Southwest |
| 04/25/22 | Sacramento, CA | | Phoenix, AZ | Southwest |
| 07/01/22 | Phoenix, AZ | | Orange County, CA | Southwest |
| 07/05/22 | Phoenix, AZ | London, England | Naples, Italy | American |
| 07/06/22 | San Diego, CA | | Phoenix, AZ | Southwest |
| 10/17/22 | Phoenix, AZ | | Long Beach, CA | Southwest |
| 01/06/23 | Phoenix, AZ | | Madison, WI | American |
| 01/10/23 | Indianapolis, IN | | Phoenix, AZ | American |

99. Glessner had several bank receipts within his possession on the date of the seizure. In addition to those, John Glessner, Jacques Glessner's father, included photocopies of other receipts with the paperwork for his claim.

100. The following is a summary of the banking activity based on the receipts.

| Date | Transaction Type | From Account | To Account | Amount |
| --- | --- | --- | --- | --- |
| 06/06/22 | Wire | Unknown | Unknown | $10,000.00 |
| 07/11/22 | Wire | Unknown | Unknown | $50,000.00 |
| 07/20/22 | Transfer | 9578 | 6442 | $25,000.00 |
| 07/20/22 | Withdrawal | 6442 | | $ 9,800.00 |
| 08/01/22 | Withdrawal | 6442 | | $ 9,800.00 |
| 08/04/22 | Withdrawal | 6442 | | $ 9,800.00 |
| 08/08/22 | Withdrawal | 6442 | | $ 9,500.00 |
| 09/14/22 | Withdrawal | 6442 | | $ 5,000.00 |
| 09/14/22 | Withdrawal | 6442 | | $ 4,000.00 |
| 09/16/22 | Withdrawal | 6442 | | $ 7,000.00 |
| 09/22/22 | Transfer | 6442 | | $ 9,400.00 |
| 09/22/22 | Transfer | 9578 | 6442 | $ 6,000.00 |
| 12/16/22 | Deposit | 9578 | 6442 | $ 8,500.00 |
| 01/03/23 | Cashier's Check to Self | 4044 | | $45,000.00 |
| 01/03/23 | Deposit | 6442 | | $ 4,650.00 |
| 01/03/23 | Deposit | 6442 | | $45,000.00 |
| 01/03/23 | Deposit | 4044 | | $ 9,000.00 |
| 01/03/23 | Transfer | 9578 | 6442 | $ 8,497.37 |
| 01/04/23 | Transfer | 6442 | 8135 | $50,000.00 |
| 01/09/23 | Deposit | 6442 | | $ 6,000.00 |
| 01/09/23 | Deposit | 6442 | | $ 9,810.00 |

101. Making frequent withdrawals and deposits of amounts less than $10,000 over a short period of time is associated with structuring transactions to avoid reporting requirements, and with money laundering activity.

**Jacque Alexander Glessner's Phone Record**

102. Investigators subpoenaed T-Mobile to request toll records for the phone Glessner was carrying which was assigned phone number (XXX) XXX-1102.

103. Investigators asked for the previous ninety-days of tolls, prior to the money seizure.

104. Records revealed the phone number (XXX) XXX-1102 belongs to a T-Mobile cellular phone registered to Janet Glessner.

105. The following information is based on the toll records from January 1, 2023 to January 10, 2023.

106. Based on public data information collection, on January 4, 2023, Glessner's phone communicated with (XXX) XXX-0800 thirty-one times.

107. According to public information data collection, this phone is listed as the phone for Bonnie Mullaney who is an owner to a marijuana cultivating business named "Right 2 Bear Farms" in Garberville, CA.

108. Additionally, during this timeframe, Glessner's phone had several contacts with (XXX) XXX-1044.

109. According to public information data collection, this phone is listed for Curtis R. Fields, III.

110. An NCIC criminal history check of Curtis R. Fields, III, revealed multiple arrests for possession of marijuana for sale, an arrest for narcotic drug possession/use, dangerous drug possession/use, and multiple arrests for possession of drug paraphernalia.

111. During the timeframe where John Glessner claimed Glessner was going to "look for a truck" in Indiana for him, investigators only identified one phone with an Indiana area code.

112. In an undercover capacity, SA Theriault called this phone number and asked, "Do you still have the Eco Diesel Silverado Pick Up Truck for sale?"

113. The male voice on the phone stated "you have the wrong number, and why are you calling from a blocked phone?"

114. John Glessner stated in his claim that Glessner was going to visit a friend in Wisconsin and then traveled to Indiana to look at an Eco Diesel Silverado to purchase, but did not follow through with the deal it because it had been in an accident.

115. Investigators conducted a records check through the Arizona Department of Motor Vehicles and as of the report's date, neither Glessner nor John Glessner had a truck currently registered under their own name.

**Jacque Alexander Glessner's Car Rental Report**

116. A search of online car rental receipts for Glessner with Arizona driver's license #XXXXXX398 though rental car databases (Enterprise, Alamo, Dollar, Hertz and Thrifty) identified the following rental receipts:

   a) A Ford with license plate #8TYS046 was rented from Enterprise on 12/01/2022 at 2:49 p.m. from the Phoenix Airport in Phoenix, AZ, and the vehicle was returned to the Phoenix Airport in Phoenix, AZ on 12/16/2022 at 11:02 a.m. The vehicle was driven a total of 4142 miles.

   b) A Ram with license plate #69901H3 was rented from Enterprise on 10/24/2022 at 1:58 p.m. from the Oakland Airport in Oakland, CA, and the vehicle was returned to the Phoenix-Mesa Airport in Mesa, AZ on November 3, 2022 at 11:51 a.m. The vehicle was driven a total of 1565 miles.

   c) A Ram with license plate #71608D3 was rented from Enterprise on 10/17/2022 at 12:57 a.m. from the Long Beach Airport in Long Beach, CA, and the vehicle was returned to the Phoenix Airport in Phoenix, AZ on October 22, 2022 at 7:02 a.m. The vehicle was driven a total of 489 miles.

   d) A Ram with license plate #675T50 was rented from Enterprise on 07/01/2022 at 1:57 p.m. from the Orange County Airport in Santa Ana, CA, and the vehicle was returned to the Burbank Airport in Burbank, CA on 07/01/2022 at 8:39 p.m. The vehicle was driven a total of 93 miles.

   e) A GMC with license plate #8XAH576 was rented from Enterprise on 06/20/2022 at 6:51 p.m. from Oakland Airport in Oakland, CA, and the

vehicle was returned to the Oakland, CA on 06/30/2022 at 3:41 p.m. The vehicle was driven a total of 2368 miles.

f) A Ford with license plate #695WPN was rented from Enterprise on 04/24/2022 at 11:45 a.m. from Sacramento Airport in Sacramento, CA, and the vehicle was returned to the Sacrament Airport in Sacramento, CA on 04/25/2022 at 8:25 p.m. The vehicle was driven a total of 447 miles.

### FIRST CLAIM FOR RELIEF

The defendant property was furnished or intended to be furnished by a person in exchange for a controlled substance or listed chemical in violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801, *et seq.*, or constitutes proceeds traceable to such an exchange, or was used or intended to be used to facilitate a violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*, and therefore is subject to forfeiture to the United States pursuant to 21 U.S.C. § 981(a)(1)(A).

### SECOND CLAIM FOR RELIEF

The defendant property constitutes or is derived from proceeds traceable to some form of specified unlawful activity, conducted and attempted to conduct a financial transaction, i.e., the movement of the proceeds of trafficking in controlled substances in violation of 18 U.S.C. § 1952, and therefore is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

WHEREFORE, the United States of America prays that process of warrant *in rem* issue for the arrest of the defendant property; that judgment be entered declaring the defendant property be forfeited to the United States of America for disposition according

/ /

/ /

to law; and that the United States of America be granted such other and further relief as this Court deems just and proper, together with the costs and disbursements of this action.

DATED this 28th day of June 2023.

GARY M. RESTAINO
United States Attorney
District of Arizona

 /S/ Joseph F. Bozdech
JOSEPH F. BOZDECH
Assistant United States Attorney